# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT
### 23-510 consolidated with 23-368

**STATE OF LOUISIANA**

**VERSUS**

**RON CLEON JOHNSON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NUMBER C32761
HONORABLE DESIREE DUHON DYESS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Sharon Darville Wilson, Judges.

**CONVICTIONS AFFIRMED; HABITUAL OFENDER SENTENCE VACATED AND REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**

**G. Paul Marx**
**Louisiana Appellate Project**
**Post Office Box 82389**
**Lafayette, LA   70598-2389**
**(337) 237-2537**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Ron Cleon Johnson**

**Billy Joseph Harrington**
**District Attorney**
**Clifford Royce Strider, III**
**Assistant Attorney General**
**R. Bray Williams**
**Assistant District Attorney**
**Post Office Box 838**
**Natchitoches, LA   71458-0838**
**200 Church Street**
**Natchitoches, LA   71457**
**(318) 357-2214**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Ron Cleon Johnson**
**Madison Parish Correctional Center**
**Building 4, Dorm D**
**158 Treatment Plant Road**
**Tallulah, LA   71282-7406**
**DEFENDANT/APPELLANT**
     **In Proper Person**

**PERRET, Judge.**

Defendant, Ron Cleon Johnson, was convicted by a jury of three counts of violation of a protective order, second offense, and was subsequently sentenced to two years on each count, to be served consecutively, in the Department of Corrections, without benefit of probation, parole, or suspension of sentence. A fine of $1,000.00 on each count was also ordered. After the State filed a habitual offender bill, Defendant was adjudicated a fourth habitual offender and sentenced to twenty years in the Department of Corrections, without benefit of probation or suspension of sentence. Defendant now appeals and challenges his convictions and sentence via pro se and counsel-filed briefs. After review, we affirm Defendant's convictions but vacate the twenty-year sentence imposed by the trial court as indeterminate and remand the matter for resentencing with instructions.

## FACTS AND PROCEDURAL BACKGROUND:

Defendant was charged and convicted of violating three separate protective orders on March 22, 2022, all three of which prohibited him from contacting Sabrina Johnson. The three protective orders were issued following three separate arrests. All three protective orders were in effect when Defendant made the phone call from jail to Sabrina on March 22, 20222. The effective dates of the protective orders were August 2, 2021–August 2, 2022; September 27, 2021–September 27, 2022; and March 22, 2022–March 22, 2023.

Defendant was charged on October 13, 2022, with two counts of misdemeanor violations of protective orders, violations of La.R.S. 14:79. The October 13, 2022 Bill of Information indicated that Defendant violated an August 2021 order and a September 2021 order on March 22, 2022, by contacting the protected person.

Subsequently, on October 27, 2022, Defendant was convicted of violation of a protective order in another docket number, C32155A. Information regarding that conviction, specifically which protective order was violated and the date it was violated, is not in the bill of information, and that information was not provided in a stipulation from the parties.

Consequently, the State filed an amended bill of information, in the instant case, charging Defendant with the same two counts originally charged, with a third count of violation of a protective order, specifically a March 2022 order, and with the enhanced charge of being a second offense on all three counts. According to La.R.S. 14:79(B)(2), it does not matter that the instant offenses occurred before the conviction used as the basis for the second offense enhancement.

Thus, on November 2, 2022, Defendant was charged by bill of information with three counts of violation of a protective order, second offense, violations of La.R.S. 14:79(B)(2). On November 15, 2022, a six-person jury found Defendant guilty of all three counts. Subsequently, on December 15, 2022, the trial court sentenced Defendant on each count to two years in the Department of Corrections, without benefit of probation, parole, or suspension of sentence. The trial court also imposed a $1,000 fine on each count and ordered the sentences to run consecutively. At the same hearing, the State filed a habitual offender bill of information, and Defendant entered a denial to the charge. On March 8, 2023, the trial court adjudicated Defendant a fourth habitual offender and sentenced him to twenty years in the Department of Corrections, without benefit of probation or suspension of sentence.

After sentencing, Defendant filed two pro se motions that were denied by the trial court—a motion for concurrent sentences and a motion to vacate and set aside

2

illegal sentence. On June 8, 2023, Defendant filed a writ application with this court seeking supervisory review of the denial of his motion to correct illegal sentence. On August 30, 2023, this court ordered the writ application and Defendant's appeal be consolidated.

On January 20, 2023, Defendant filed a pro se Motion to Appeal Conviction and Sentence. On February 8, 2023, Defendant filed a pro se motion for out-of-time appeal, which was granted that same date. Now before the court is a brief filed by Defendant's appellate counsel, alleging four assignments of error—three attacking Defendant's convictions and one alleging excessive sentence. Also before the court is a pro se brief filed by Defendant, alleging five assignments of error, all of which challenge his convictions.

Counsel-Filed Assignments of Error:

I.      The conviction in this case violates the constitutional bar against double jeopardy, where the State relied on one phone call from the jail to convict Ron Cleon Johnson of a misdemeanor offense, and then to convict him on three felony counts.

II.      The protective orders recited in the [second] amended bill of information . . . were not in effect on the March 22, 2022 date of offense. The restraining orders issued as a condition of bail were dismissed when bail was revoked on March 22, 2022.

III.      There was insufficient evidence to convict, where the State could not prove beyond a reasonable doubt that the single phone call relied on by the State was made to the alleged "protected person" in the protective orders.

IV.      The mandatory 20 year minimum under R.S. 15:529 was an excessive sentence, as there are no predicate convictions other than property crimes, and the single phone call introduced into evidence was not a threatening or harassing communication.

Pro Se Assignments of Error:

I.      The evidence to which the (state) used at trial to convict the appellant being the recorded jailhouse phone call was ruled by the trial court upon the prior date of October 24, 2022, as inadmissible

3

evidence and the presiding judge Hon. Desiree Duhon Dyess "allowed the inadmissible evidence to be introduced at trial which is illegal on behalf of the trial court to do so and to allow such.

II.    The conviction of count number []3[] of the second amended bill of information of trial docket number []32761-A[] amounts to "double jeopardy." Because the appellant was previously convicted of the exact same identical offense within the misdemeanor trial docket number []32155-A. Louisiana law prohibits sentencing an accused defendant "twice" as for the same criminal charged offense.

III.   The conviction in this case to which the prosecution for the state used coerced perjured testimony of the state's witness, namely: Mr. Yancy Spillman who actually violated the appellant's due process rights when failing to comply with the statutory mandates of Louisiana Electronic Surveillance Act. La.R.S. 15:1310 as the state's witness, namely: Yancy Spillman in his official capacity as an investigatory employee at: Natchitoches Parish Jail, disregarded Louisiana Statutory Law in failing to obtain or verify if the trial court judge issued an order authorizing or approving interception of recorded jail phone calls regarding the specific phone call of March 22, 2022, jail phone call.

IV.    The Natchitoches Parish Clerk of Court [] Deputy Clerk: Whitney Charles, upon the prior date of: 11/14/2022, was instructed, thus ordered by the trial court to read the criminal accusation being the second amended Bill of Information to which the above named officer of the trial court incorrectly misinformed the jurors at the beginning of trial that the appellant defendant had been previously convicted upon the prior date of October 27, 2022, of a felony?

When in fact the defendant was only convicted of a misdemeanor offense and not a felony so therefore the jurors during trial was [sic] provided incorrect reading of the second amended bill of information.

V.     The trial court "erred and abused its discretion" when continuing with the trial court proceeding after the defendant properly informed the court upon the record at the beginning of trial that he had a pending supervisory writ application, within the third circuit court of appeal regarding his prior predicate conviction out of Lafayette Parish trial docket number []157844[,] and the trial court disregarded such whereas the trial proceeding continued in an unlawful manner.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find two errors patent involving Defendant's habitual offender sentence, one of which requires

4

Defendant's habitual offender sentence be vacated and the case remanded for resentencing.

First, we find that the trial court imposed an indeterminate habitual offender sentence. Defendant was found guilty of three counts of violation of a protective order, second offense. At the original sentencing hearing on December 15, 2022, the trial court sentenced Defendant on each count to two years in the Louisiana Department of Corrections, without benefit of parole, probation, or suspension of sentence. The trial court also imposed a $1,000 fine on each count and ordered each of the counts to run consecutively. On that same date, the State filed a habitual offender bill, charging Defendant as a fourth habitual offender. At a habitual offender hearing on March 8, 2023, the trial court found that Defendant was a fourth felony offender and vacated "defendant's prior sentence, rendered on December 15, 2022[.]" The trial court then sentenced Defendant to serve twenty years at lard labor without benefit of probation or suspension of sentence.

Because the trial court vacated the original "sentence," but three sentences had been originally imposed, and then imposed only one habitual offender sentence, Defendant's habitual offender sentence is indeterminate. Although it is possible for the State to seek habitual offender enhancement on only one of the original sentences, it is not clear that the State intended to do so in the present case. The State alleged in the habitual offender bill that Defendant "was convicted by a jury of Violation of a Protective Order, Second Offense, a felony, in violation of La.R.S. 14:79, on November 15, 2022, which was committed on March 22, 2022." This language does not clearly single out any one of the three convictions for violation of a protective order, second offense. Additionally, the State's prayer in the habitual offender bill does not single out any one conviction. Consequently, it is not clear

5

whether the trial court intended to vacate only one original sentence and impose a habitual offender sentence on that count alone, and, if so, which count, or whether the trial court intended to vacate all the original sentences and impose a habitual offender sentence on each. If the latter is the case, the trial court erred in imposing only one habitual offender sentence.

As a result, the habitual offender sentence is indeterminate and must be vacated. The case is remanded for resentencing, with the trial court instructed to specify which of the original sentences are vacated. For each sentence that is vacated, the trial court is instructed to impose a separate sentence and specify whether the sentence is being enhanced pursuant to the habitual offender adjudication.

Secondly, although the trial court imposed the habitual offender sentence without benefit of probation or suspension of sentence, it failed to impose any portion of the habitual offender sentence without benefit of parole. "[T]he restrictions on parole eligibility imposed on multiple offender sentences under La.R.S. 15:529.1 'are those called for in the reference statute.'" *State v. Tate*, 99-1483, pp. 1–2 (La. 11/24/99), 747 So.2d 519, 520. At the time Defendant committed the offenses at issue, the penalty provision for violation of a protective order, second offense, required at least fourteen days to be served without benefit of parole. La.R.S. 14:79(B)(2). Accordingly, we instruct the trial court that at least fourteen days of the sentences imposed upon Defendant, whether enhanced as a habitual offender or not, must be served without benefit of parole as well as without benefit of probation or suspension of sentence.

6

**COUNSEL-FILED ASSIGNMENT OF ERROR NUMBER 3:**

In this assignment of error, Defendant makes a sufficiency of the evidence argument. We consider this assignment of error first, in accordance with *State v. Hearold*, 603 So.2d 731 (La.1992) (sufficiency of the evidence should be addressed prior to trial errors as the defendant may be entitled to an acquittal). In all three protective orders that he was accused of violating, Defendant was prohibited from contacting, including by telephone, the protected person named "Sabrina Johnson." Thus, in this assignment of error, Defendant asserts that the State failed to prove beyond a reasonable doubt that the March 22, 2022 phone call was made to the Sabrina Johnson protected by the protective orders.

*Standard of Review*

In reviewing the sufficiency of evidence, this court has set forth the standard of review as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

7

*State v. Worley*, 21-688, pp. 3–4 (La.App. 3 Cir. 8/3/22), 344 So.3d 757, 760, *writ denied*, 22-1381 (La. 12/20/22), 352 So.3d 86.

*Evidence Introduced at Trial*

At the beginning of trial, the parties stipulated that on October 27, 2022, Defendant was convicted of violation of a protective order, a violation of La.R.S. 14:79, in docket number C32155A. Defendant was sentenced to six months in parish prison and fined $500. This was the eventual basis for amending the bill of information and charging Defendant with violating La.R.S. 14:79 (B)(2).

The first witness to testify was Lieutenant Gregory Eldridge of the Natchitoches Parish Sheriff's Office Correction Bureau. According to Lieutenant Eldridge, Defendant was incarcerated at the Natchitoches Parish Detention Center. The lieutenant identified State's Exhibit One as a protective order in docket number C31538A. When asked to name the defendant in the protective order, Lieutenant Eldridge named Ron Johnson, Defendant in the present case. Lieutenant Eldridge testified that the protected person was Sabrina Johnson. According to Lieutenant Eldridge, the protective order, signed by Judge Dyess on August 2, 2021, ordered Defendant not to contact the protected person personally through any means, including telephone. Lieutenant Eldridge testified that the protective order was in effect until August 2, 2022.

Lieutenant Eldridge identified State's Exhibit Two as another protective order naming Ron Johnson as the defendant and the protected person as Sabrina Johnson. The order was signed on September 27, 2021, and remained in effect until September 27, 2022. Like State's Exhibit One, the protective order labeled State's Exhibit Two prohibited Defendant from contacting the protected person by any means, including telephone.

8

The next witness to testify was Terry Williams, a patrol officer with the Natchitoches Parish Sheriff's Office. Officer Williams identified State's Exhibit Three as a protective order that named Ron Johnson as the defendant and Sabrina Johnson as the protected person. Identifying Defendant's signature on the protective order, Officer Williams stated that it was effective beginning March 22, 2022, and expired on March 22, 2023. According to Officer Williams, he served the protective order on Defendant after a bond hearing held March 22, 2022.

A redacted copy of the March 22, 2022 bond reduction hearing was introduced as State's Exhibit Four. The State directed Officer Williams to a portion of Exhibit Four, which Office Williams recognized as the trial judge stating the following to Defendant:

> She said, uh, as an additional condition of this arrest, you need to have no contact with the victim, Sabrina Johnson. This contact includes . . . and she reads off what's actually on the protective order. This includes no personal contact, no third-party contact, no telephone contact, no email contact, no text messaging contact, no contact via social network sites, uh, send no messages to the victim whether it is by a family member . . . uh, no contact means no contact.

According to Officer Williams, the trial judge informed Defendant that the new protective order remained in effect until March 22, 2023, unless extended by the court.

Yancy Spillman, a detective with the Natchitoches Parish Sheriff's Office, listened to the outgoing phone calls made by inmates. According to Detective Spillman, every phone call made by an inmate is automatically recorded. As for Defendant in particular, Detective Spillman testified that he was very familiar with Defendant and saw him in the facility most every day. Detective Spillman further testified that he had personally listened to some of Defendant's phone calls and was able to recognize Defendant's voice. When asked how he was able to recognize

9

Defendant's voice, Detective Spillman responded that he had talked to Defendant "face to face" "a lot." The detective estimated that he had listened to hundreds of phone calls made by Defendant.

Detective Spillman testified that he was contacted by the Natchitoches Police Department regarding a specific phone call made by Defendant on March 22, 2022.[1] When asked if he was able to find the specific phone call, Detective Spillman responded, "Yes[,]" and explained that every call has the date, the time, the inmate's PIN, and the destination being called. Detective Spillman identified the phone call as being made on March 22, 2022, at 5:28 p.m., from Defendant's PIN, and he identified the destination phone number. According to Detective Spillman, he also recognized Defendant's voice in the phone call. Detective Spillman confirmed that the phone call was initiated by Defendant. Detective Spillman identified State's Exhibit Six as the transcript of the phone call made by Defendant to Sabrina Johnson on March 22, 2022 at 5:28 p.m. The transcript of the phone call was published to the jury, and the audio of the call was played for the jury.

On cross-examination, the following colloquy took place regarding the detective's knowledge that the recipient of the phone call in question was Sabrina Johnson:

> Q.      Okay. So, you don't know . . . you can only guess whose number that is? What foundation do you have, that that number is a Sabrina Johnson?
>
> A.      I'm just going off . . . I don't know if that's Sabrina Johnson. You asked me, is there a method for me to be able to find out a destination number. And, yes, there is [sic] ways I can, but I didn't do that on this number.

---

[1] Detective Spillman stated that he believed the phone call was made on March 22, 2020 or 2022. The State then asked, "So, March 2, 2022?" Detective Spillman replied, "Yeah." Later in his testimony, however, Detective Spillman confirmed that the phone call was made on March 22, 2022.

Acknowledging that he had never met the Sabrina Johnson who was the subject of the protective order in question and acknowledging that he did not know for sure that the person Defendant called was the same Sabrina Johnson that was the subject of the protective order, Detective Spillman testified: "I know a Sabrina. . . I know it's a Sabrina that he talks to, what she looks like, but I don't know if it's the same Sabrina.

On re-direct examination, Detective Spillman testified that in the transcript of the phone call, State's Exhibit Six, Defendant called the person he was speaking to "Sabrina" and told her he loved her. Defendant also told Sabrina to go on with her life and that "[i]t's over with." Defendant also mentioned that pictures had been taken of Sabrina's neck and the side of her face. According to Detective Spillman, Defendant complained in the phone call about the police taking pictures of Sabrina's neck and face the night of his arrest. Detective Spillman read from a portion of the phone call transcript wherein Defendant referred to events that had occurred the previous weekend, specifically mentioning that he had put his hands on Sabrina. Finally, Detective Spillman read a portion of the phone call transcript wherein Defendant told Sabrina that he knew she would not testify against him.

The next witness, Detective Shamaria Lewis, testified that he received a call about a domestic disturbance sometime in March. According to Detective Lewis, a female reported that a male subject was causing a disturbance. Detective Lewis testified that he was in the courtroom when the telephone call was played and identified the voices as Ronald Johnson and Sabrina Johnson. According to Detective Lewis, he had met Sabrina Johnson twice before and had had a long conversation with her. Detective Lewis also recognized the phone number called by Defendant as being Sabrina Johnson's phone number.

11

When asked if he heard Defendant mention photographs during the phone conversation, Detective Lewis testified that Defendant referred to a situation between Defendant and "Ms. Sabrina." Detective Lewis agreed that he was the one who took photographs of Sabrina Johnson. When asked if he had any doubt as to the identity of the voices on the telephone call, Detective Lewis responded, "No, I know who [sic] voice is on the phone call. There's no doubt at all." Finally, on re-direct examination, the following colloquy occurred between the State and Detective Lewis:

Q.   Detective Lewis, who are the two voices on that telephone call?

A.   Mr. Ron Johnson, and Ms. Sabrina Johnson.

Q.   Is there any doubt [sic] your mind as to the ID of those two voices?

A.   No, Sir. No doubt at all.

Q.   And that's because of your personal interactions with both Ron Johnson and Sabrina Johnson.

A.   Yes, sir. I spent quite some time dealing with that situation. So, there's no doubt at all.

Q.   And facts that you testified to, that Mr. Johnson's speaking of, in his phone call, those were specific to your involvement with those two individuals, isn't that correct?

A.   Yes, Sir, that is correct.

Q.   And the number she gave you as her number, that's the number that's listed there on the television screen is it not? As the phone call that he made from the Detention Center . . . he being Mr. Johnson?

A.   Yes, Sir, that's the number she gave me, and told me I could contact her at.

As stated previously, the transcript of the phone call in question was introduced as State's Exhibit Six. In the call, Defendant called the recipient, "Sabrina." Defendant told Sabrina he loved her but that "it" was over and that she

12

should go on with her life. When Sabrina asked Defendant what he was talking about, Defendant complained about his bond being revoked. Defendant accused Sabrina of letting the police take pictures of her neck and the side of her face. Defendant also told Sabrina that her statement was read in court.

Although Defendant acknowledged that he was high, that he was drunk, and that he was not in his right mind, he blamed his incarceration on Sabrina's call to the police. Defendant questioned Sabrina as to how they could have a relationship while he was in prison. Continuing to lament over his predicament, Defendant told Sabrina that he loves her, that he made a mistake, that he was not in his right mind, and that he would not have put his hands on her.

When Sabrina said there must be something they could do, Defendant told her not to throw his things in the trash. Sabrina told Defendant that she would not throw his stuff away but would take it to his mom's house when she was forced to leave the apartment. Defendant asked Sabrina why she would have to leave the apartment, and Sabrina explained that she could not afford to pay the bills by herself.

During the phone call, Defendant told Sabrina that he knew she would not "come to court on none of that sh[] (inaudible) against [him]." Defendant further told Sabrina to do what she had to do but to tell any man she is with that her "husband" is in jail. Sabrina told Defendant that she loved him and would wait for him.

*Defendant's Argument*

Defendant argues the following in support of the sufficiency assignment of error:

> The record of this case has no testimony from the victim, who actually filed affidavits recanting her claims of abuse (Rec. 483-484), and she was never informed of her right to petition the court to amend

13

or suspend protective orders. In fact, the laws provides [sic] that a bail condition regarding communication "shall not apply if the victim consents by way of a request to the court and the court issues an order permitting the communication" (La. C.Cr.P. Art. 320). The District Attorney tendered Sabrina's affidavits in lieu of the testimony of the state's "Victim Advocacy" person.[2] There is no evidence anyone informed Sabrina of this right, but in fact, the tenor of the phone call in this case and Sabrina's accepting the call when it could easily have been blocked indicate she would have made that request.

The evidence introduced at the trial of this case, when viewed under the Jackson v. Virginia, 443 U.S. 307 (1979) standard, was insufficient to prove beyond a reasonable doubt that the "Sabrina" referenced in the phone call was the "protected person" who was not to be contacted.

*State's Argument*

The State summarizes the evidence introduced at trial, arguing that the evidence was sufficient to convict Defendant. The State asserts that Detective Spillman testified about his review of the transcript of the March 22, 2022 phone call, noting that Defendant spoke in great detail to Sabrina about their relationship and about the events that led up to the March 22, 2022 bond revocation and new protective order. The State further asserts:

Mr. Johnson's call makes references to the pictures that a law enforcement officer took of the back of 'Sabrina's[] neck and side of her face (RP 848) and that he was not himself the past weekend when he put his hands on 'Sabrina'. . . .

In his appeal, Mr. Johnson complains that Sabrina Johnson did not testify at his trial. It should be noted that during his illegal phone call to her on March 22, 2022[,] he stated that he did not believe she would come to trial . . ., exhibiting a classic tool of manipulation and abuse.

Finally, the State notes that Detective Lewis confirmed that he was the arresting officer that took pictures of Sabrina Johnson after an incident between her and Defendant. The State asserts that this was the same incident Defendant

---

[2]The hearing at which these affidavits were introduced was a bond reduction hearing.

14

complained to Sabrina about in the March 22, 2022 phone call. Further, the State notes that Detective Lewis testified that he recognized both voices in the phone call as belonging to Defendant and Sabrina Johnson and confirmed that the phone number called by Defendant on March 22, 2022 was the same number that Sabrina Johnson gave to Detective Lewis.

*Law and Analysis*

As for appellate review in cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017). "When a trier of fact has reasonably rejected the hypothesis of innocence proposed by the defense at trial, the defendant is guilty unless an alternative hypothesis is sufficiently reasonable that rational jurors must have a reasonable doubt as to guilt." *State v. Fields*, 02-388, p. 2 (La. 3/18/03), 842 So.2d 316, 317.

Defense counsel's closing argument focused on the lack of proof that the protected person named in the protective orders at issue was the same person Defendant spoke to during the March 22, 2022 jail phone call. The jury obviously rejected this defense when, instead, it found Defendant guilty of all three counts of violating a protective order. Considering the testimony of Detective Lewis (his identification of the voices on the phone call, his testimony regarding his history with Sabrina Johnson, his knowledge of Sabrina Johnson's phone number) as well as the transcript of the March 22, 2022 phone call (describing the arrest incident and photographs as well as establishing the relationship between Defendant and Sabrina) we find that the jury's rejection of Defendant's hypothesis of innocence was reasonable.

Further considering the absence of any evidence that Defendant had a relationship with another woman named "Sabrina," the jury reasonably concluded that the Sabrina Johnson called by Defendant on March 22, 2022, was the same Sabrina Johnson that Defendant was ordered not to contact in the three protective orders at issue.

For the foregoing reasons, this assignment of error lacks merit.

**COUNSEL-FILED ASSIGNMENT OF ERROR NUMBER 1:**

Defendant asserts that his convictions violate double jeopardy, "where the State relied on one phone call from the jail to convict Ron Cleon Johnson of a misdemeanor offense[] and then to convict him of three felony counts."

*Law*

> It is unconstitutional to place a person twice in jeopardy of life or limb for the same offense. *State v. Steele*, 387 So.2d 1175 (La.1980). "The guarantee against double jeopardy provides three central constitutional protections" one of which is "protection against multiple punishments for the same offense." *State v. Brown*, 42,188, 42,189,

16

42,190, p. 38 (La.App. 2 Cir. 9/26/07), 966 So.2d 727, 755. We must determine whether a single or multiple offenses were involved.

> The Louisiana Supreme Court has very recently announced that Louisiana courts "are bound only to apply the standard established by the U.S. Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) to protect against double jeopardy[.]" *State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27. Under the *Blockburger* test, "there is no double jeopardy . . . where each provision requires proof of an additional distinct element that the other does not." *State v. Cooley*, 11-959, p. 12 (La.App. 3 Cir. 4/4/12), 87 So.3d 285, 295, *writ denied*, 12-1008 (La. 10/26/12), 99 So.3d 640. In other words, "a defendant can be convicted of two offenses arising out of the same criminal incident if each crime contains an element not found in the other." *Frank*, 234 So.3d at 30, (*citing State v. Balentine*, 47,858, p. 2 (La.App. 2 Cir. 7/10/13), 119 So.3d 979, 985 (Drew, J., dissenting) ).

*State v. Hampton*, 17-383, pp. 11–12 (La.App. 3 Cir. 11/15/17), 259 So.3d 1125, 1132 (alterations in original).

*Defendant's Argument*

Defendant claims that this case presents "a classic violation of double jeopardy: the state presented evidence of a single phone call[] and sought to punish Mr. Johnson four times for that single transgression." In the actual assignment of error, Defendant contends that he was convicted of a misdemeanor offense and then convicted of three felony offenses. In the case at issue, Defendant was convicted of three offenses. Thus, it is not clear what Defendant is referring to when he states that he was punished "four times" for a single transgression. Since Defendant does not provide any particular information about the misdemeanor offense, we cannot determine to what offense Defendant is referring.

As previously mentioned, the parties stipulated that on October 27, 2022, Defendant was convicted of a misdemeanor violation of a protective order. The factual basis for the misdemeanor conviction, however, was not introduced. Thus, it is not possible to determine whether that misdemeanor conviction was based on

17

the same conduct or the same protective orders that Defendant's three current convictions are based upon. Accordingly, we find that Defendant failed to prove that the misdemeanor conviction was for the same offense or offenses involved in Defendant's three convictions for violations of protective orders.

However, Defendant also states: "The protective orders were duplicitous, and that one act is not punishable as three separate crimes simply because there were three copies of the Uniform Domestic order to stay away from Sabrina Johnson." Defendant further states:

> The state charged violation of three protective orders by a single phone call on March 22, 2022 . . . .
>
> . . . .
>
> . . . the state took the position that the protective orders were in force at the time of the March 22, 2022 phone call, and so the state could stack the charges and sentence consecutively for each one.

Considering the above, we will focus on Defendant's double-jeopardy claim that each of his three current convictions for violation of a protective order are based on the same conduct, i.e. the single phone call made on March 22, 2022.

*State's Argument*

In response to Defendant's argument that it is double jeopardy to base his three felony convictions upon the same phone call, the State asserts that there is no double jeopardy because each of the convictions was based on a different protective order. Each protective order was issued on a different date, and each was issued for different offenses committed by Defendant. The State contends that it was required to prove additional facts for each offense—the protective order's effective dates and the underlying basis for the order. Consequently, the State argues, each protective

order was a "new order and not merely an extension of an existing order." The State

further argues (footnote omitted):

> Art. 320 embodies the strong public policy in Louisiana to protect victims of domestic violence. Art. 320(L) mandates that the trial court shall order a protective order regardless of whether another already exists "under any other provision of law". Each court order is a binding order on the defendant[,] and the defendant can be held accountable for the violation of each protective order.
>
> This is not the case that a protective order that was issued by a trial court was then extended[,] and [the] basis [sic] for the order remained the same. Each protective order in this case was based on new criminal charges stemming from different conduct that occurred on different dates for which Mr. Johnson was arrested for and bail set. If one of the three docket numbers that Mr. Johnson had a protective order issued against him pursuant to Art. 320 were dismissed in its entirety, it would not affect the validity of the other two issued protective orders. If Mr. Johnson violated the term(s) of those two remaining protective orders, he could be prosecuted for violating both orders through two separate counts.
>
> Mr. Johnson's argument that he was subjected to double jeopardy is meritless[,] and his Assignment of Error No. 1 should be denied.

*Analysis*

Defendant was convicted of three counts of violating a protective order, a

violation of La.R.S. 14:79, which provides, in pertinent part:

> A. (1)(a) Violation of protective orders is the willful disobedience of a preliminary or permanent injunction or protective order issued pursuant to R.S. 9:361 et seq., R.S. 9:372, R.S. 46:2131 et seq., R.S. 46:2151, R.S. 46:2171 et seq., R.S. 46:2181 et seq., Children's Code Article 1564 et seq., Code of Civil Procedure Articles 3604 and 3607.1, or Code of Criminal Procedure Articles 320 and 871.1 after a contradictory court hearing, or the willful disobedience of a temporary restraining order or any ex parte protective order issued pursuant to R.S. 9:361 et seq., R.S. 9:372, R.S. 46:2131 et seq., R.S. 46:2151, R.S. 46:2171 et seq., criminal stay-away orders as provided for in Code of Criminal Procedure Article 320, Children's Code Article 1564 et seq., or Code of Civil Procedure Articles 3604 and 3607.1, if the defendant has been given notice of the temporary restraining order or ex parte protective order by service of process as required by law.
>
> . . . .

19

(3) Violation of protective orders shall also include the willful disobedience of the following:

(a) An order issued by any state, federal, parish, city, or municipal court judge, magistrate judge, commissioner or justice of the peace that a criminal defendant stay away from a specific person or persons as a condition of that defendant's release on bond.

For count one, the jury found Defendant guilty of violating a protective order issued on August 2, 2021, which was effective through August 2, 2022. The August 2021 protective order was issued based on "domestic abuse aggravated battery-strangulation[,] stalking[.]" For count two, the jury found Defendant guilty of violating a protective order issued on September 27, 2021, and effective through September 27, 2022. The September 2021 protective order was issued based on a violation of La.R.S. 14:34.1 (second degree battery). Finally, for count three, the jury found Defendant guilty of violating a protective order issued on March 22, 2022, and effective until March 22, 2023. The March 2022 protective order was issued based on a violation of La.R.S. 14:35.3(L) (domestic abuse battery by strangulation) **and** a violation of La.R.S. 14:79 (violation of protective order).

Since the three offenses for which Defendant was convicted, i.e. violations of La.R.S. 14:79, are all the same crime, it is arguable that the elements for each offense are the same. Thus, at first glance, it appears that the *Blockburger* analysis indicates that double jeopardy was violated in this case. However, it is also arguable that since each conviction involved a different protective order, the "protective order" element was different for each conviction. Thus, under *Blockburger*, each conviction would have a unique element and would not violate double jeopardy. As discussed below, a different type of analysis may be more appropriate.

Faced with a similar factual circumstance, a court of appeal in Virginia used a different type of analysis. In *Groffel v. Commonwealth*, 831 S.E.2d 503, 506

(2019), *aff'd*, 849 S.E.2d 905 (2020), the defendant argued that "he received multiple convictions and punishments for the same offense in violation of the constitutional protection against double jeopardy." Groffel was charged with five counts of transporting a firearm while subject to five separate protective orders. *Id.* The five protective orders were issued by different courts and issued to protect five different individuals. The Virginia Court of Appeals began its double jeopardy analysis as follows:

> "The Fifth Amendment to the Constitution of the United States declares that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " Severance v. Commonwealth, 295 Va. 564, 571-72, 572 n.8, 816 S.E.2d 277 (2018) (quoting U.S. Const. amend. V) (noting that the Virginia Constitution provides the same protections). This prohibition includes protection from "multiple punishments for the same offense." Id. at 572, 816 S.E.2d 277 (quoting Commonwealth v. Gregg, 295 Va. 293, 298, 811 S.E.2d 254 (2018)). "We review de novo whether 'multiple punishments have been imposed for the same offense in violation of the double jeopardy clause.' " Gregg, 295 Va. at 296, 811 S.E.2d 254 (quoting Johnson v. Commonwealth, 292 Va. 738, 741, 793 S.E.2d 321 (2016)).
>
> "When considering multiple punishments for a single transaction, the controlling factor is legislative intent." Id. at 298, 811 S.E.2d 254 (quoting Kelsoe v. Commonwealth, 226 Va. 197, 199, 308 S.E.2d 104 (1983)). In determining legislative intent, the court first looks to the plain language of the statute. Baker v. Commonwealth, 284 Va. 572, 576, 733 S.E.2d 642 (2012). "If the language is clear and unambiguous, [an appellate court] will assign the statute its plain meaning." Browning-Ferris Indus. of S. Atl. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 492 S.E.2d 431 (1997). Additionally, we must "give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity." Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174 (2007). On the other hand, if the statutory language is ambiguous, the court must rely on "the gravamen of the offense to determine the legislature's intent" regarding the permissible unit of prosecution. See Baker, 284 Va. at 576, 733 S.E.2d 642; see also Johnson, 292 Va. at 741-42, 793 S.E.2d 321 (examining legislative intent in order to determine "the unit of prosecution"); Acey v. Commonwealth, 29 Va. App. 240, 250-51, 511 S.E.2d 429 (1999) (analyzing the gravamen of an offense in considering "the unit of prosecution by which the state may assess punishment").

21

. . . .

Code § 18.2-308.1:4(A) provides, in pertinent part, that "[i]t is unlawful for any person who is subject to . . . a protective order . . . to purchase or transport any firearm while the order is in effect." The appellant's transportation of the firearm found strapped to his ankle when he was captured and arrested while subject to five protective orders was the basis for five separate convictions and corresponding sentences. The question for this Court to resolve is whether the statute penalizes the act of purchasing or transporting a firearm while subject to multiple protective orders as a single offense or as multiple ones subject to separate punishments.

In answering this question, we first look to the statutory language. See Baker, 284 Va. at 576, 733 S.E.2d 642. Only if the plain text is ambiguous do we "us[e] the gravamen of the offense to determine the legislature's intent." Id.

The language in Code § 18.2-308.1:4(A) is ambiguous on this point because it "can be understood in more than one way." See id. (quoting Boynton v. Kilgore, 271 Va. 220, 227 n.8, 623 S.E.2d 922 (2006)); see also Acey, 29 Va. App. at 250, 511 S.E.2d 429 (analyzing the gravamen of the offense of possession of a firearm by a convicted felon in violation of Code § 18.2-308.2). On the one hand, the statute prohibits the purchase or transportation of a firearm by a person subject to "a protective order." The use of the singular "a" suggests that for each protective order in place, the act of purchase or transportation of a firearm constitutes a separate offense. Johnson, 292 Va. at 742, 793 S.E.2d 321 (holding that the statutory phrase " 'a' felony" provided that "each felony charge could serve as the predicate of a failure to appear conviction"). On the other hand, the language "any person who is subject to" suggests that the statute describes a class of people who are forbidden from buying or transporting firearms and that the prohibited conduct is the purchase or transportation regardless of the number of protective orders in place. See United States v. Dunford, 148 F.3d 385, 388-89 (4th Cir. 1998) (holding that possession of a firearm or ammunition is a single offense regardless of the number of disqualifying classes to which a defendant belongs).

As a result of this ambiguity, we must look to the gravamen, or essence, of the crime. We conclude that the purpose of Code § 18.2-308.1:4 is to protect the individuals who are the subjects of the protective orders. In some circumstances, a petitioner obtains a protective order on his or her own behalf. See generally Code §§ 16.1-253.1, -279.1 (allowing issuance of a protective order against an allegedly abusive person in order "to protect the health and safety of the petitioner [or any] family or household member[ ] of the petitioner"). In others, "[u]pon the motion of any person or upon the court's own motion," a court may enter a protective order to protect a

child who has been subjected to parental abuse or neglect. See Code §§ 16.1-253(A), (F), -278.2(C). Each protective order entered to safeguard a unique principal protected person (the principal), whether a petitioner or a child of an allegedly abusive or neglectful parent, "has a separate existence with separate consequences and effects." See Johnson, 292 Va. at 742, 793 S.E.2d 321 (discussing summonses and felony charges). The focus of Code § 18.2-308.1:4 must be upon the principal whom each protective order is in place to protect. Therefore, the gravamen of the offense of the purchase or transportation of a firearm by a person subject to *a protective order* is the occurrence of the act *while the protective order is in effect*.

This purpose and gravamen contrast with those of a statute prohibiting possession of a firearm. The purpose of a firearm possession statute is to protect society generally from the individual who belongs to a described class or group such as previously convicted felons. See Baker, 284 Va. at 578, 733 S.E.2d 642. Consequently, the gravamen of the offense of possession of a firearm by a convicted felon is the possession itself. See Acey, 29 Va. App. at 250, 511 S.E.2d 429. Here, the gravamen of an offense under Code § 18.2-308.1:4 is not possession, but it is the purchase or transportation of a firearm while the protective order is in effect because the purpose of the statute is to protect each principal.

In support of his argument that the *possession* is the gravamen of an offense under Code § 18.2-308.1:4, the appellant relies on cases interpreting 18 U.S.C. § 922(g). See United States v. Borer, 394 F.3d 569, amended by 412 F.3d 987 (8th Cir. 2005); United States v. Baker, 197 F.3d 211 (6th Cir. 1999); Dunford, 148 F.3d 385; United States v. Ocampo, 919 F. Supp. 2d 898 (E.D. Mich. 2013). The federal subsection prohibits, in pertinent part, "any person" within the listed categories from "possess[ing] . . . any firearm or ammunition." 18 U.S.C. § 922(g). The categories include people who are subject to protective orders, convicted felons, fugitives from justice, "unlawful user[s] of or addicted to any controlled substance," people who have been committed to a mental institution, aliens unlawfully in the United States, and those who have been convicted of domestic violence. 18 U.S.C. § 922(g)(1)-(5), (8)-(9). While the United States Congress chose to prohibit these categories of individuals from having access to firearms by grouping them together in a subsection as a single "possession" offense, the Virginia legislature enacted separate statutes to restrict access, possession, and transportation of firearms for certain groups. This distinction signifies the Virginia General Assembly's conclusion that the different groups of individuals under restrictions are dissimilar and subject to different limitations as well as penalties. As a result of this contrast between the federal and state law, the federal cases interpreting 18 U.S.C. § 922(g) are inapposite to application of Code § 18.2-308.1:4.

23

The appellant also relies on the principle that if the statutory language at issue can be read to impart two reasonable and contradictory interpretations, a court should construe the statute in the accused's favor. See McGinnis v. Commonwealth, 296 Va. 489, 504, 821 S.E.2d 700 (2018). However, this rule, known as the " 'rule of lenity,' " "does not permit a[n appellant] to benefit from an unreasonably restrictive interpretation of the statute." Id. (quoting Blake v. Commonwealth, 288 Va. 375, 386, 764 S.E.2d 105 (2014)). In other words, the general principle cannot apply to subvert the legislature's intent when such intent is ascertainable from the statute based on its language, purpose, or gravamen. See Turner v. Commonwealth, 295 Va. 104, 109, 809 S.E.2d 679, cert. denied, ⸺ U.S. ⸺, 139 S. Ct. 123, 202 L.Ed.2d 77 (2018); Spratley v. Commonwealth, 69 Va. App. 314, 320, 818 S.E.2d 823 (2018). Accordingly, the legislature's intent to provide for multiple units of prosecution under Code § 18.2-308.1:4 based on multiple protective orders in place to safeguard different principals outweighs application of the rule of lenity.

Turning to the facts of this case, while the appellant was subject to five different protective orders protecting five different principals, he transported a firearm. This action constituted five different violations of Code § 18.2-308.1:4(A). This conclusion comports with the purpose of the statute to further safeguard the principal whom each of the orders was entered to protect. It is also consistent with the gravamen of the offense, the purchase or transportation of a firearm by a person subject to *a protective order while the protective order is in effect*.

For these reasons, the appellant's single act of transporting a firearm logically resulted in separate and distinct charges based on the five protective orders entered to protect five different principals. The five convictions and sentences did not violate the appellant's constitutional protection against double jeopardy. Consequently, we affirm the convictions and sentences for transportation of a firearm by a person subject to a protective order.

*Id.* at 506–09 (alterations in original) (footnotes omitted).

The present case is distinguishable from *Groffel* since the protective orders in the present case were issued in favor of the same individual. Nonetheless, the analysis used by the court in *Groffel* offers guidance in this case. Additionally, the analysis used by *Groffel* is very similar to the analysis used by the Louisiana Supreme Court in *State v. Fussell*, 06-2595 (La. 1/16/08), 974 So.2d 1223, to

24

determine whether the possession of multiple pornographic images should be treated as a single offense.

In *Fussell*, the Louisiana Supreme Court concluded that the legislative intent in enacting La.R.S. 14:81.1 was to permit separate convictions on separate counts "for each child, in each sexual performance in which that child is victimized, that is captured in any photographs, films, videotapes, or other visual reproductions that a defendant intentionally possesses." *Id.* at 1235. The defendant was indicted for "nineteen counts of intentional possession of pornography involving juveniles, in violation of La.R.S. 14:81.1(A)(3)." *Id.* at 1225. Seventeen of those counts "were for corresponding computer-printed pages, each page containing one or more images, that were found in a closet at Defendant's mother's home," where he lived. *Id.* The other two counts "were also for corresponding computer-printed pages, each page containing one or more images, that were found in Defendant's truck at the time of his arrest." *Id.* Defendant was convicted of sixteen of the nineteen counts, each with their own sentences to run consecutively. The third circuit reduced the possession of pornography convictions to one conviction.

Although the court in *Fussell* chose not to use the term "unit of prosecution," it acknowledged the inquiry that the term identifies:

> At the outset, we note that the conflicting First and Third Circuit Courts of Appeal decisions that prompted our present inquiry, as well as the briefs filed on behalf of the State and Defendant, describe our task as one to determine the proper "unit of prosecution" under La. R.S. 14:81.1(A)(3). The term "unit of prosecution," however, does not appear in our Criminal Code and is not commonly used in the State of Louisiana. Rather, the term emerged within federal jurisprudence as shorthand for the determination necessary for deciding whether a defendant's conduct "gives rise to multiple convictions or punishments ..." under an applicable statute. *United States v. Reedy*, 304 F.3d 358, 365 (5th Cir.2002); *see also Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (addressing the "recurring problem" of determining " '[w]hat Congress ha[d] made the allowable unit of

> prosecution [ ]' under a statute which does not explicitly give the answer" (citation omitted)). While "unit of prosecution" is not commonly used within this state's jurisprudence, the inquiry that the term identifies—determining how many counts a defendant can be charged with under a criminal statute—is often necessary. *See, e.g., State v. Joles*, 492 So.2d 490 (La.1986), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987) ("At issue in this case is the legality of imposing separate sentences on defendant after convictions of twenty *counts* (charged separately in a single bill of information) of violating La. R.S. 14:67 by twenty separate acts of theft . . . ."(emphasis added)). Accordingly, to maintain consistency within our jurisprudence, this Court will forego use of the term "unit of prosecution" within this opinion and, instead, focus our discussion on "counts" and "convictions."

*Id*. at 1227 (alterations in original).

The court in *Fussell* stated that the issue before it was whether a "defendant can be charged with multiple counts of possessing multiple images of child pornography or, rather, whether the defendant should be charged with only one count for a single act of possession of multiple images of child pornography." *Id.* at 1228. Similar to the court in *Groffel*, the court in *Fussell* recognized: "'the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law.'" *Id.* at 1231(citations omitted).

The starting point, the court in *Fussell* acknowledged, "is the language of the statute itself." *Id.* at 1231 (citation omitted). The court further stated:

> In this case, we acknowledge that La. R.S. 14:81.1(A)(3), when read alone rather than in its full statutory context, is not a model of statutory clarity. Read in isolation, it is conceivable that one analyzing the language of this particular statutory provision could determine that La. R.S. 14:81.1(A)(3) is susceptible to more than one meaning. As such, by focusing on the legislature's use of the plural form for the provision's list of contraband items, La. R.S. 14:81.1(A)(3) could, as the Third Circuit posited in the instant matter, permit only one count, regardless of the number of pornographic images possessed. Conversely, a reading focused on the word "any," similar to that of the First Circuit in [*State v.*] *Kujawa*, [05-470 (La.App. 1 Cir. 2/22/06), 929 So.2d 99, *writ denied*, 06-669 (La. 10/6/06), 938 So.2d 65] could lead

26

a reader to believe that the provision is aimed at prohibiting the intentional possession of every single image of child pornography and that the legislature's use of the plural form for the list of contraband items was merely a matter of grammatical style.

> When the language of a criminal statute is susceptible to more than one meaning, the statute "should be so interpreted as to be in harmony with, preserve, and effectuate the manifest intent of the legislature, and an interpretation should be avoided which would operate to defeat the purpose and object of the statute." *State v. Williams*, 03-3514, p. 2 (La.12/13/04), 893 So.2d 7, 21; *see also State v. Brown*, 03-2788, p. 6 (La.7/6/04), 879 So.2d 1276, 1280, *reh'g denied*, 9/3/04; *State v. Broussard*, 213 La. 338, 34 So.2d 883, 884 (1948). In targeting their analyses so exclusively on the language of La. R.S. 14:81.1(A)(3), however, the courts of appeal below have focused too narrowly on this provision specifically and have done so at the expense of its full statutory context. As we noted above, "it is a well-recognized and long-established rule of statutory construction that a statute should be interpreted as a whole to effect the legislative intent and should be construed in such way as to reconcile, if possible, apparent inconsistencies or ambiguities so that each part is given effect." *State ex rel. A.M.*, 98-2752, p. 2 (La.7/2/99), 739 So.2d 188, 190 (emphasis added). Accordingly, we now look to the language of La. R.S. 14:81.1 in its entirety to guide our interpretation of the proper application of La. R.S. 14:81.1(A)(3).

*Id*. at 1232.

The pertinent language referred to by *Fussell* read as follows: "*The intentional possession, sale, distribution, or possession with intent to sell or distribute of any photographs, films, videotapes, or other visual reproductions of any sexual performance involving a child under the age of seventeen.*" *Id.* at 1227.

Upon review, the supreme court found that "the language of La. R.S. 14:81.1(A) reveals that each of its proscribed offenses is tethered to the visual reproduction of *any sexual performance* involving *a child* under the age of seventeen[.]" *Id*. at 1233.

The court continued:

> Indeed, without a sexual performance involving a child, none of these offenses could be committed. Inversely, each of these offenses is committed if just one child is involved in one single sexual performance. Thus, read in this context, the language of La. R.S. 14:81.1(A) indicates that each of its prohibitions—La. R.S.

14:81.1(A)(3) included—revolves around a legislative goal to protect *any single child* from being sexually exploited through the visual reproduction of *any single sexual performance* involving that child.

*Id.*

The supreme court also examined other provisions along with La.R.S. 14:81.1 and determined that the legislature was motivated by a "'protectionist' goal when drafting its child pornography prohibitions." *Id.* at 1233.

Accordingly, the court held:

Thus, in the instant matter, we hold that the language of La. R.S. 14:81.1(A)(3) evidences a legislative intent to allow a separate conviction on a separate count for each child, in each sexual performance in which that child is victimized, that is captured in any photographs, films, videotapes, or other visual reproductions that a defendant intentionally possesses.

*Id.* at 1235.

In the present case, the pertinent language in the statute at issue now reads as follows:

(3) Violation of protective orders shall also include the willful disobedience of the following:

(a) An order issued by any state, federal, parish, city, or municipal court judge, magistrate judge, commissioner or justice of the peace that a criminal defendant stay away from a specific person or persons as a condition of that defendant's release on bond.

La.R.S. 14:79(A)(3)(a).

As the court discussed in *Fussell* with respect to the pornography statute, the legislature's use of the plural form of "protective orders" could be interpreted as permitting the charging of one count only, regardless of the number of protective orders in place. Conversely, a reading focused on the words "[a]n order issued by any state" could lead a reader to believe that the provision is aimed at prohibiting

28

the violation of every protective order in place. Thus, as in *Fussell*, the language of La.R.S. 14:79 is susceptible to more than one meaning.

In determining the legislature's intent, we conclude that the intent was to punish the violation of each and every protective order, which is evidenced by the following provisions. Louisiana Code of Criminal Procedure Article 320(L) provides:

> Under no circumstances shall any court deny the issuance of a protective order pursuant to any provision of this Article on the ground that a protective order has already been issued under any other provision of law. Any protective order issued pursuant to this Article shall remain in effect for the time that the criminal case is pending until sentencing unless the person protected by the protective order moves the court to dissolve the protective order as to that person and the court grants the motion to dissolve the protective order as to that person.

Additionally, La.R.S. 46:2131 evidences the legislature's intent to protect victims of domestic abuse:

> The purpose of this Part is to recognize and address the complex legal and social problems created by domestic violence. The legislature finds that existing laws which regulate the dissolution of marriage do not adequately address problems of protecting and assisting the victims of domestic abuse. The legislature further finds that previous societal attitudes have been reflected in the policies and practices of law enforcement agencies and prosecutors which have resulted in different treatment of crimes occurring between family members, household members, or dating partners and those occurring between strangers. It is the intent of the legislature to provide a civil remedy for domestic violence which will afford the victim immediate and easily accessible protection. Furthermore, it is the intent of the legislature that the official response of law enforcement agencies to cases of domestic violence shall stress the enforcement of laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated.

Although the above statute refers to a civil remedy for domestic violence, rather than the criminal provision at issue in this case, the legislature's intent to protect victims of domestic violence is clear. In a concurring opinion, a judge from

29

the first circuit court of appeal stated the following regarding the legislature's

concern for victims of domestic violence:

> In 2014 and 2015, the Louisiana Legislature recognized that domestic violence is a major problem in Louisiana. By 2014 La. Acts 2014, No. 663, the legislature created the Domestic Violence Prevention Commission. In creating the commission, "[t]he Legislature of Louisiana recognize[d] that domestic violence inflicts physical, emotional, and financial injury on its victim and exists in every segment of our population. Approximately [32.9%] of women and [28.1%] of men in the United States have experienced physical violence by an intimate partner in their lifetime . . ." and "Louisiana leads the nation in domestic homicides and has done so since 1997 . . ." Pursuant to these legislative recognitions, in 2014, the legislature by 2014 La. Acts, No. 316 amended La. C.C. 103, effective August 1, 2014, by adding La. C.C. 103(4) to provide grounds for an immediate divorce when "[t]he other spouse has physically or sexually abused the spouse seeking a divorce or a child of one of the spouses, regardless of whether the other spouse was prosecuted." Notably, Mr. Ennis could have filed for an immediate divorce based upon Mrs. Ennis's criminal acts. In addition, he could have also obtained a domestic violence protective order against Mrs. Ennis since her conduct constituted "[d]omestic abuse," which is defined in La. R.S. 46:2132(3) as including, but not being limited to "physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana except negligent injury and defamation, by one family member, household member, or dating partner against another."

*Ennis v. Ennis*, 16-423, pp. 4–5 (La.App. 1 Cir. 5/8/17) (Welch, J., concurring)

(unpublished opinion).

Finally, the second circuit stated the following regarding the legislature's

intent to give broad protection to all victims of violence:

> This action by the legislature, in amending and expanding the definition of conduct prohibited by La. R.S. 14:79(A)(1)(a), shows that when a stay-away order is made a condition of bail in cases of domestic abuse or dating violence, the trial court is to enter an Abuse Prevention Order and to transmit it to the Louisiana Protective Order Registry. However, the legislature also provided that the willful disobedience of a condition of bail that the defendant stay away from a person or persons will also result in a violation of La. R.S. 14:79(A)(3)(a) without the entry of an Abuse Prevention Order and without reference to domestic abuse or dating violence. The statutory scheme shows that the legislature, through the fair import of the words of the statute, intended to give broad protection to all victims of violence. The words

of the statute are clear and free from ambiguity and we will apply them as written.

*State v. Kumar*, 46,056, pp. 8–9 (La.App. 2 Cir. 3/2/11), 58 So.3d 544, 551.

Considering the legislature's intent to protect victims of domestic violence and its allowance in La.Code Crim.P. art. 320(L) for multiple protective orders to be in effect at the same time, we conclude that the legislature intended for a single act to constitute a violation of each protective order in effect. Thus, Defendant's three convictions for violating a protective order in the present case do not constitute a violation of double jeopardy.

Accordingly, this assignment of error lacks merit.

**COUNSEL-FILED ASSIGNMENT OF ERROR NUMBER 2:**

Defendant contends that two of the protective orders, which he is charged with violating, were not in effect on March 22, 2022, the date on which he made the prohibited phone call. According to Defendant, the protective orders issued on August 2, 2021, and September 27, 2021, were issued as conditions of bail and were dismissed when bail was revoked on March 22, 2022. On that date, the trial court set a bond for the new charge of domestic abuse battery by strangulation and a bond for Defendant's violation of a previous protective order. The trial court again ordered Defendant to have no contact with Sabrina Johnson and issued a new protective order.

In response, the State contends that "[t]he trial court certainly did not dismiss and replace the previous protective orders . . . because to do so . . . would have been a direct violation of Art. 320(L)." As discussed in Assignment of Error Number 1, La.Code Crim.P. art. 320(L) mandates protective orders to remain in effect while the case is pending, until sentencing. Although Defendant acknowledges Article

31

320(L), Defendant contends that the "statute is not suggesting that the same relief can be recognized in multiple orders so that a single act can be punished beyond the statutory provisions." Defendant further argues:

> There is no provision for the same two parties dealing with 3 protective orders which are enjoining the same conduct. The court issued one order, three different times to push the deadline for protection beyond the year. There is no authority for imposing three sentences on one prohibited act, and in creating a new order at the March hearing[,] the trial court was tacitly acknowledging that her revocation of the bail meant the connected protection orders were mooted. That was the reason for another order in March of 2022.

The trial court stated the following at the March 22, 2022 bond reduction hearing:

> Additionally, the Court takes note that through each of the previous bond orders you have been ordered to have no contact with Sabrina Johnson. Additionally, there was a protective order in effect. Irregardless [sic] of whatever statements or affidavits that were filed with the District Attorney's Office . . .
>
> . . . .
>
> . . . my orders are still valid orders, as long as these charges are pending.

Considering La.Code Crim.P. art. 320(L) and the above statement by the trial court, Defendant fails to prove that the August 2, 2021 and September 27, 2021 protective orders were not in effect at the time of the prohibited phone call.

Accordingly, this assignment lacks merit.

## COUNSEL-FILED ASSIGNMENT OF ERROR NUMBER 4:

Defendant contends that the mandatory twenty-year sentence under La.R.S. 15:529.1 was excessive. This assignment of error is pretermitted by our recognition of an error patent in Defendant's sentence. As a result of the error patent, the habitual offender sentence is indeterminate and must be vacated.

## PRO SE ASSIGNMENT OF ERROR NUMBER 1:

Defendant claims that the trial court improperly permitted evidence, i.e., the recorded phone call, previously deemed inadmissible to be introduced at trial. More specifically, Defendant alleges that the Louisiana Electronic Surveillance Act (La.R.S. 15:1310) was not complied with when the phone call was recorded in this case. Defendant further claims that the State committed malfeasance in office by instituting prosecution based upon the inadmissible recording of the phone call. Citing the Louisiana Rules of Professional Conduct, Defendant asserts that "a prosecutor shall refrain from prosecuting a charge that is not supported by probable cause."

In support of his argument, Defendant contends that the trial court ruled the phone call inadmissible and attaches an October 24, 2022 Order by the trial court to his brief. In the Order, the trial court ruled the "subject recorded telephone calls are INADMISSIBLE unless the State can establish any applicable exceptions to the Electronic Surveillance Act[.]" However, the trial court subsequently granted the State's Motion in Limine for Admission of Defendant's Recorded Phone Calls and Incorporated Memorandum. Both the phone call and a transcript of the call were introduced at trial.

While the State points out Defendant's misstatement regarding the trial court's ruling and also addresses the merits of the admissibility of the recorded phone call, we find that Defendant does not sufficiently brief the merits of this issue. Uniform Rules—Courts of Appeal Rule 2–12.4. Defendant fails to specify how the State failed to comply with La.R.S. 15:1310. Furthermore, any arguments made in the trial court are not in the record before this court. When the phone call and a transcript of the call were introduced at trial, defense counsel objected "for the

reasons previously ruled on by this Court[.]" It is not clear to what previous objection/argument defense counsel was referring. The minutes of jury selection state the following:

> Mr. Bokenfohr advised the Court that [i]t previously ruled on the pre-trial hearings in this matter. Mr. Bokenfohr advised the Court that during the hearings of some of the motion[s] he noted his objection to the Court's rulings[,] and he would like the Court to note his objections again to the recording while the Jury was not present.

In the trial court's ruling granting the State's motion in limine, the trial court referred to "reasons assigned on the State's Motion in Limine heard before this Honorable Court on November 10, 2022." There is no minute entry and/or transcript for that date included in the record.

In light of Defendant's failure to refer to such minute entry/transcript and in light of Defendant's failure to specify any reason why the requirements of La.R.S. 15:1310 were not met, we find that this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 2:**

In this assignment of error, Defendant claims that his protection against double jeopardy was violated by being convicted and sentenced twice for the same charge in the same docket number (32155-A). Defendant asserts that he was "convicted and sentenced upon 10-27-2022, six months parish jail time same charge violation of protective order and convicted and sentenced upon 12/15/2022, two years hard labor same charge violation of protective order, count No. [] 3. Of the re-filed second amended Bill of Information trial docket number #32761-A."

This pro se double jeopardy claim is different than the attorney-filed double jeopardy claim. As previously discussed, the attorney-filed double jeopardy claim alleges that the use of one phone call to convict Defendant of three different violations of protective orders was a violation of double jeopardy. The pro se double

34

jeopardy claim, on the other hand, argues that Defendant was convicted and sentenced twice for the same offense he pled to or was convicted of in lower court docket number 32155-A.

Count three of the bill of information in this case states that on or about March 22, 2022, Defendant did:

> COMMIT THE OFFENSE OF VIOLATION OF A PROTECTIVE ORDER ISSUED ON 03/22/22 UNDER DOCKET NUMBER C32155A FOR THE PROTECTION OF THE PERSON S.J. BY CONTACTING THE PROTECTED PERSON S.J[.], SECOND OFFENSE, IN VIOLATION OF R.S. 14:79(B)(2), HAVING PREVIOUSLY BEEN CONVICTED OF VIOLATION OF A PROTECTIVE ORDER IN THE TENTH JUDICIAL DISTRICT COURT ON OCTOBER 27, 2022, A FELONY.

The stipulation entered into by the parties regarding Defendant's prior conviction reads as follows:

> The State and the defendant stipulate to the following facts as being true:
>
> The defendant, Ron Cleon Johnson, date of birth December 2, 1969, was convicted of Violation of a Protective Order, Louisiana Revised Statutes 14:79, in Natchitoches Parish Criminal Docket No. C32155A on October 27, 2022. On that same date he was sentenced to serve six (6) months in the Parish Prison and fined $500.00.

It is evident from the above that Defendant was convicted twice for violation of a protective order in docket number 32155A. What is not evident, however, is the factual basis for the October 27, 2022 conviction for violation of a protective order. As previously mentioned, the stipulation does not indicate which protective order Defendant was convicted of violating, and it does not set forth the date that the violation occurred.

Double jeopardy prevents a person from being punished twice for the same *offense*. *Hampton*, 259 So.3d 1125. Since no factual basis for the October 27, 2022

35

conviction is in the record before this court, it is not possible to determine whether Defendant was, in fact, convicted twice for the same offense.

Accordingly, this assignment lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 3:**

Defendant alleges that the trial court erred in allowing the perjured testimony of the State's witness, Detective Spillman. Defendant claims that Detective Spillman lied at trial and conspired with the prosecutor and Detective Lewis. Defendant cites the following portion of Detective Spillman's trial testimony:

Q.    Were you contacted by the Natchitoches Police Department about Mr. Johnson's phone calls?

A.    Yes, it was by Detective Lewis.

Q.    And what did Detective Lewis want?

A.    He was looking for a specific phone call from I think it was March 22, 2020 or 2022 . . . I . . . yeah.

. . . .

Q.    And did you provide Detective Lewis with those phone calls?

A.    Yes.

Defendant asks this court to compare this testimony with the following statement made by the trial court at the habitual offender hearing:

On March 23, 2022, Natchitoches Police Department [was] contacted by personnel of the Natchitoches Parish Detention Center, in reference to Mr. Johnson, who was then and there incarcerated, contacting adjudicated victim, Sabrina Jackson (sic), who had an active protective order against Mr. Johnson.

Defendant argues the following:

The appellant Ron Cleon Johnson argues specifically how would be [sic] possible for the Detective Lewis to have had any knowledge of any phone calls being made or called from the jail when Detective Lewis is not an employee of the jail because the jail is operated by the Natchitoches Parish Sheriff's Department and Detective Lewis is

36

employed with the City of Natchitoches Police Department which is two separate law enforcement agencies. So therefore, based upon this argument the higher supervisory 3rd Circuit Court of Appeals can clearly see upon the record as aforementioned that the prosecutor Richardy Bray Williams, coached and/or coerced the witness while under sworn oath on the witness stand at trial[,] and the witness[,] Yancy Spillman, also perjured himself as to his testimony for the state within connection to this case.

In its response, the State first asserts that it is a baseless allegation and should be considered waived for lack of a contemporaneous objection. Out of an abundance of caution, however, the State argues that Defendant's claim implicates *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173 (1959). The State then asserts the following:

> The Louisiana Supreme Court has detailed what a defendant must establish in order to prove a *Napue* claim.
>
> > To prove a *Napue* claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. *Id.* at 269, 79 S.Ct. 1173. Furthermore, fundamental fairness to an accused, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony would have affected the outcome of the trial. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Defendant's argument is wholly unsubstantiated, as he failed to provide any evidence in support of his allegation and merely relies on his bare assertion. We accordingly reject the contention based on this record and relegate defendant to post-conviction relief if evidence in this regard is subsequently obtained.[]

*State v. Broadway*, 96-2659 (La. 10/19/99) 753 So.2d 801, 814.

As seen in *Broadway*, Mr. Johnson makes the bare assertion that Det. Spillman and Det. Lewis perjured themselves in how his monitored and recorded phone call from the Detention Center to the

protected person, Sabrina Johnson, was obtained by Det. Lewis. Mr. Johnson's assertion is wholly unsubstantiated. Det. Lewis testified that he obtained the phone call that Mr. Johnson made to the protected person, Sabrina Johnson, from Det. Spillman. . . . Det. Spillman also testified that Det. Lewis obtained Mr. Johnson's phone calls from Det. Spillman . . . .

Mr. Johnson's baseless allegation of perjury rests solely on the fact that the two law enforcement officers worked for different law enforcement agencies. Mr. Johnson utterly fails to establish that the facts testified to by both Dets. Spillman and Lewis are somehow false or that the State somehow colluded with these witnesses to facilitate false testimony.

We agree. Defendant's claim of perjury was not preserved for review and is not substantiated by any evidence. Thus, this assignment lacks merit.

## PRO SE ASSIGNMENT OF ERROR NUMBER 4:

Defendant asserts that the trial judge erred in failing to correct the minute clerk when she misinformed the jurors that Defendant was previously convicted of a felony offense instead of a misdemeanor offense. Defendant further asserts that the second amended Bill of Information incorrectly refers to the previous conviction as a felony.

The minute clerk informed the jurors of the following:

On or about March 22, 2022 did unlawfully commit Count 1, the offense of Violation of Protective Order issued on 08/22/2021 under Docket Number C31538A for the protection of the protected person, SJ, by contacting the protected person, SJ., 2nd offense in violation of Revised Statute 14:79, Subsection B, subsection 2, have [sic] previously been convicted of Violation of a Protective Order in the 10th Judicial District Court on October 27, 2022, a felony.

The minute clerk repeated this information as to counts two and three. In informing the jurors of these charges, the minute clerk read verbatim from the charges in the Second Amended Bill of Information.

However, we note that the concluding phrase "a felony" at the end of each charge in the bill of information is a reference to the current charge, not the previous misdemeanor offense. Thus, this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 5:**

Defendant claims that because he had a pending writ application regarding his prior predicate offense, the trial court erred in failing to stop the trial proceedings to determine the status of the writ application. In its response, the State asserts that the trial court recessed the habitual offender proceeding to allow the State to investigate the status of any pending writ application. According to the State, no writ application was pending. Thus, the trial court did not abuse its discretion in denying Defendant's request to continue the habitual offender hearing.

At the beginning of the habitual offender hearing, Defendant notified the court that he had filed a writ application with the third circuit regarding one of the predicate offenses used against him in the habitual offender bill. The trial court recessed the hearing to allow counsel to check on the status of any pending writ applications. When they returned, the State informed the court that it had spoken with "Kathy" at the third circuit court of appeal. According to "Kathy" the State reported, there were no pending writ applications in the current docket number. Although "Kathy" found that two writ applications had been filed in docket number C32155A, both had been denied. The State further informed the trial court that "Kathy" said there were currently no pending writs or appeals related to Defendant.

The trial court proceeded with the habitual offender hearing but was interrupted by defense counsel. Defense counsel informed the trial court that Defendant said that the writ was filed in docket number 157844, and the writ alleged that there was no *Boykin* colloquy. Regardless of whether a writ was pending or not,

39

the trial court stated that the habitual offender hearing would proceed as Defendant had adequate remedy on appeal. The trial court denied Defendant's request for a stay.

After conducting our own search of the records in this court, we found no writ applications were pending at the time of the habitual offender hearing, March 8, 2023. Accordingly, this assignment of error lacks merit.[3]

## DECREE:

Considering the above, Defendant's convictions are affirmed. Defendant's habitual offender sentence, however, is vacated as indeterminate, and the case is remanded for resentencing with instructions. The trial court is instructed to specify which of the original sentences were vacated. For each sentence that was vacated, the trial court is instructed to impose a separate sentence, specifying whether the sentence is being enhanced pursuant to the habitual offender adjudication. Furthermore, the trial court is instructed that at least fourteen days of the sentences imposed upon Defendant, whether enhanced as a habitual offender or not, must be served without benefit of parole as well as without benefit of probation or suspension of sentence.

**CONVICTIONS AFFIRMED; HABITUAL OFENDER SENTENCE VACATED AND REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**

---

[3]Although not listed as a pro se assignment of error, Defendant sets out an issue number "6," questioning whether the habitual offender bill of information was valid. Since that issue was not briefed, it is considered abandoned. Uniform Rules—Courts of Appeal Rule 2–12.4(B)(4).